**David PRAGER, III, Plaintiff,**

v.

**John D. LAFAVER, Secretary of the Kansas Department of Revenue, in his Personal Capacity, Defendant.**

**No. 97–4216–DES.**

United States District Court,
D. Kansas.

June 16, 2000.

Louis F. Eisenbarth, Michael E. Francis, Alan V. Johnson, Myron L. Listrom, Sloan, Listrom, Eisenbarth, Sloan & Glassman, Topeka, KS, for David Prager, III, plaintiff.

Thomas V. Murray, Charles F. Blaser, Barber, Emerson, Springer, Zinn & Murray, L.C., Lawrence, KS, Terence Edward Leibold, Terrence J. Campbell, Barber, Emerson, Springer, Zinn & Murray, LC, Lawrence, KS, for John D LaFaver, Secretary of the Kansas Department of Revenue, defendant.

### MEMORANDUM AND ORDER

SAFFELS, District Judge.

This matter is before the court on defendant's Motion to Dismiss (Doc. 30). This motion pertains only to Count II of the plaintiff's amended complaint. Both parties have fully briefed this issue and the court is now ready to rule.

## I. BACKGROUND

Prior to his termination in 1997, the plaintiff had been an Attorney III, classified civil service employee with permanent status with the Kansas Department of Revenue since 1988. On October 31, 1996, the plaintiff delivered a memo to his supervisor, Richard Oxandale, General Counsel for the Department of Revenue, regarding a corporate income tax appeal ("Tax Appeal A") for which the plaintiff was responsible. The memo stated that the tax laws had been misinterpreted by Mr. Oxandale and the defendant in another tax appeal ("Tax Appeal B"), which was being handled by another attorney in the Department of Revenue. Both Tax Appeal A and Tax Appeal B involved the issue of whether a federal agreement to extend the federal assessment limitation period extends the time period for a Kansas refund claim under Kan.Stat.Ann. § 79–3230(e).

In his memo of October 31, 1996, the plaintiff informed Mr. Oxandale that little or no legal research had been done in arriving at the erroneous interpretation of Kan.Stat.Ann. § 79–3230(e) in Tax Appeal B, resulting in an illegal tax refund of $1.0 million to Taxpayer B. The plaintiff's memo provided three pages of legal analysis, explaining why Kan.Stat.Ann. § 79–3230(e) had been erroneously interpreted by Mr. Oxandale and the defendant in Tax Appeal B. The plaintiff's memo went on to request a meeting with Mr. Oxandale and the defendant to discuss their erroneous interpretation of Kan.Stat.Ann. § 79–3230(e) in Tax Appeal B, and to determine that the law should be properly followed in Tax Appeal A. Mr. Oxandale never arranged such a meeting.

On December 18, 1996, the plaintiff sent a twelve-page letter to Kansas Governor Bill Graves, which included a number of lengthy attachments. The letter to Governor Graves addressed several issues which the plaintiff alleges were of public concern. One of those issues was a well-publicized income tax controversy involving La Siesta Foods, Inc. The plaintiff asserted that the

tax abatement in the La Siesta case was illegal and that the defendant was the one who had agreed to and caused the illegal La Siesta abatement. The plaintiff also asserted that the Kansas Department of Revenue's administrative process had been circumvented by politics. Finally, the plaintiff expressed his concern over taxpayers' perception of unfair treatment by the Kansas Department of Revenue.

On January 8, 1997, the defendant sent a letter to the plaintiff, suspending the plaintiff from his employment with pay pursuant to Kan.Admin.Regs. 1–10–7. In the first sentence of this letter, the Secretary stated, "I am in receipt of your unfortunate correspondence to the Governor regarding an array of tax issues at the Department of Revenue." Referring to the plaintiff's letter to the Governor, the Secretary went on to say, "You have imagined events that did not occur, and you have characterized actions of the Governor and me that I took with full legal advice as 'illegal'." The Secretary's letter further stated:

> That you chose to send such a letter to the Governor without discussing it with the General Counsel or me reflects poorly upon your judgment and your willingness and ability to work as a member of this team. Clearly the letter requires a thorough review of matters alluded to in the letter as well as other matters relating to the fairness and propriety of actions the department has taken in corporate tax litigation.

On February 6, 1997, the plaintiff filed a timely appeal with the Kansas Civil Service Board, contending that his suspension by the defendant was contrary to Kan. Stat.Ann. § 75–2973, the Kansas "whistleblower" statute. Specifically, the plaintiff contended that his suspension was in retaliation for his reporting to Mr. Oxandale and Governor Graves that the defendant had violated the tax laws in regard to the La Siesta tax case.

On March 17, 1997, the plaintiff sent another letter to Governor Graves, expressing the plaintiff's concerns about a possible illegal tax refund in Tax Appeal A. This same issue had also been the subject of the plaintiff's earlier memo of October 31, 1996, to Mr. Oxandale. The March 17 letter to Governor Graves stated in part:

> I am writing to inform you that in a currently pending corporate income tax administrative appeal ("Appeal A") it is apparent that Secretary LaFaver or Richard Oxandale, or both, intend to act so as to violate the law or violate their legal obligation to the State. The anticipated violation is likely to result in substantial injury to the State through the payment of an illegal refund, which could exceed $1.0 million in Appeal A.

> .    .    .    .    .

> In providing professional, legal representation in the course of my employment with the State of Kansas, the State of Kansas has always been and is my client. While Secretary LaFaver and Mr. Oxandale may have their own opinions regarding the La Siesta appeal, Appeal A and B or other tax appeals, it is my duty to differ with their opinions when they cause the tax laws to be violated. Please act to prevent Secretary LaFaver and Mr. Oxandale from causing an illegal refund to be issued in Appeal A.

The plaintiff sent copies of his March 17 letter to both the defendant and Mr. Oxandale.

On May 9, 1997, the defendant sent an eleven-page letter to the plaintiff, advising the plaintiff that he would be terminated from his employment with the Department of Revenue effective May 16, 1997. In the first paragraph of this letter, the Secretary summarized his reasons for discharging the plaintiff, saying:

> It is my belief that your actions as an attorney with this Department have evinced an overall lack of judgment, insubordination, violation of confidentiality in revealing private tax matters and matters concerning our former attorney-client relationship, acting contrary to the

interests of your client and exhibiting personal conduct detrimental to the state service which has caused undue disruption of the normal operation and proper functioning of this Department, all and each of which constitutes gross misconduct on your part, and conduct grossly unbecoming an attorney with this Department.

On June 6, 1997, the plaintiff filed a timely consolidated appeal with the Civil Service Board, contending that his suspension and termination from employment were unreasonable and in violation of Kan. Stat.Ann. § 75–2973.

On June 12, 1997, an article on the plaintiff's appeal of his termination from employment was published in *The Topeka Capital–Journal.* The article in *The Topeka Capital–Journal* quoted several passages from the defendant's termination letter of May 9, 1997, to the plaintiff, including the following:

'Pursuant to my review of allegations made in your December 18, 1996, letter and memorandum, it has now become apparent to me that you have in fact engaged in a pattern of abusive and at times ruthless tactics in dealing with taxpayers and their representatives, and that this has been occurring for years'.

. . . . .

'These allegations of yours [concerning the La Siesta case] are obviously based on mere surmise and fantasy derived from newspaper articles. As such, your conduct was not only reckless and unethical, but constitutes gross misconduct.'

In Count II of the amended complaint, the plaintiff alleges that the defendant deprived him of the plaintiff's liberty interest in his good name, reputation, honor and integrity. The defendant has filed a motion to dismiss the count and has asserted a qualified immunity defense.

## II. STANDARD FOR A MOTION TO DISMISS

The court may not dismiss a cause of action for failure to state a claim under Rule 12(b)(6) unless it appears beyond doubt that the claimant can prove no set of facts supporting its claim which would entitle it to relief. *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 249–50, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). In considering a Rule 12(b)(6) motion, the court must assume as true all well-pleaded facts, as distinguished from conclusory allegations, and must draw all reasonable inferences in favor of the nonmovant. *Housing Auth. of the Kaw Tribe v. City of Ponca City,* 952 F.2d 1183, 1187 (10th Cir.1991); *Swanson v. Bixler,* 750 F.2d 810, 813 (10th Cir.1984). The issue in reviewing the sufficiency of a complaint is not whether the plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support its claim. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), overruled on other grounds, *Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984).

## III. ANALYSIS

### A. Qualified Immunity Defense

The defendant claims that he is entitled to qualified immunity on the plaintiff's claim contained in Count II of the amended complaint. The defense of qualified immunity represents an "attempt to balance the need to preserve an avenue for vindication of constitutional rights with the desire to shield public officials from undue interference in the performance of their duties as a result of baseless claims." *Pueblo Neighborhood Health Centers, Inc. v. Losavio,* 847 F.2d 642, 645 (10th Cir.1988). An assertion of qualified immunity requires evaluation under the standard articulated by the Supreme Court in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In *Harlow,* the Supreme Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable

person would have known." *Id.* at 818, 102 S.Ct. 2727.

■ Once a defendant raises a qualified immunity defense, the burden shifts to the plaintiff to show both facts and law to establish that the defendant is not entitled to a qualified immunity. *Dixon v. Richer,* 922 F.2d 1456, 1460 (10th Cir.1991). The plaintiff must "come forward with facts or allegations sufficient to show both that the defendant's alleged conduct violated the law and that the particular law was clearly established when the alleged violation occurred." *Pueblo Neighborhood,* 847 F.2d at 646. If the plaintiff meets this burden, then the normal burden of the movant for a motion to dismiss falls again upon the defendant. *See id.* In the context of a qualified immunity defense, the Tenth Circuit has traditionally required plaintiffs to meet a heightened pleading standard. *See Sawyer v. County of Creek,* 908 F.2d 663, 667 (10th Cir.1990).

■■ If the plaintiff fails to carry either part of his two-part burden, the defendant is entitled to immunity from suit and other demands of litigation. *Siegert v. Gilley,* 500 U.S. 226, 232–33, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991); *Workman v. Jordan,* 958 F.2d 332, 336 (10th Cir.1992). On the other hand, if the plaintiff successfully meets his initial burden as a matter of law, he may be entitled to discovery on the immunity question before a motion for summary judgment on qualified immunity grounds can be resolved. *Anderson v. Creighton,* 483 U.S. 635, 646–47 n. 6, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Workman,* 958 F.2d at 336. The question of whether the defendant is entitled to qualified immunity is a legal one and the court cannot avoid the question by framing it as a factual issue. *Pueblo Neighborhood,* 847 F.2d at 645–46.

Following the *Harlow* analysis on qualified immunity, there is no dispute that as to the first prong—the defendant was a "government official performing a discretionary function." *Harlow,* 457 U.S. at 818, 102 S.Ct. 2727. Therefore, the court must turn to the second *Harlow* prong—

whether the defendant violated "clearly established statutory or constitutional rights of which a reasonable person would have known...." *Id.* There is also no dispute that the plaintiff has alleged a deprivation of a constitutional right—the plaintiff's liberty interest in his good name, reputation, honor and integrity. *See Workman v. Jordan,* 32 F.3d 475, 481 (10th Cir.1994). Therefore, the issue before the court is whether those rights were clearly established at the time of the deprivation.

## B. Sufficiency of Plaintiff's Claims

■ The plaintiff's second cause of action is based upon a claim that the defendant's actions deprived him of a liberty interest. In order to sufficiently plead this claim, the plaintiff must be able to show that (1) statements made by the defendant impugned the plaintiff's good name, reputation, honor, or integrity; (2) the statements were false; (3) the statements occurred in the course of his discharge or that they foreclosed other employment opportunities; and (4) the statements were published. *Workman v. Jordan,* 32 F.3d 475, 481 (10th Cir.1994). The plaintiff must be able to show all four of these elements in order to prevail. *Id.* If the plaintiff has sufficiently pled a deprivation of his liberty interest, the due process protections of the Fourteenth Amendment arise and the plaintiff must show he was not afforded an adequate name-clearing hearing. *Id.*

■ In order for the plaintiff to prevail on a constitutional claim, the defendant's statements "must implicate 'dishonesty or immorality' in order to deprive an employee of a liberty interest in his good name and reputation." *Walker v. Elbert,* 75 F.3d 592, 597 (10th Cir.1996). The defendant claims that the statements made in the plaintiff's termination letter "did not deal with 'dishonesty or immorality' at all."

The statements in question accused the plaintiff of engaging in a "pattern of abusive and at times ruthless tactics in dealing with taxpayers." The defendant also ac-

cused the plaintiff of being "reckless," "unethical," as well as accusing him of "gross misconduct." The defendant claims that plaintiff has failed to state with particularity how these statements deal with "dishonesty or immorality." In addition, the defendant claims that there is no clearly established law which would have reasonably led him to believe that the statements could lead to a violation of the plaintiff's constitutional rights.

The court finds the defendant's arguments to be without merit. Clearly, calling an individual "unethical" brings up implications dealing with "dishonesty or immorality." The defendant has asked the court to take a very technical meaning of all of the statements made in the letter and try to find a way to rule that they are not stigmatizing. For instance, the defendant points out that attorneys are held to a high ethical standard and that being called unethical **"does not necessarily** make the attorney dishonest or immoral." (Emphasis added). However, the plaintiff is not required to prove his claims are "necessarily" true to survive a motion to dismiss, even with the heightened pleading standard in this case brought about by the qualified immunity claim. The court finds that there is clearly enough of a factual dispute surrounding the statements made by the defendant concerning the issue of whether they implicate "dishonesty or immorality" that the motion to dismiss on this ground must be denied and that issue be decided by the trier of fact in this case.

The defendant next claims that the plaintiff has failed to make a sufficient showing that the statements in the letter were published by the defendant. There is no question that the letter became public at some point as it was referenced at length in a *Topeka–Capitol Journal* article. However, the issue which remains is how the contents of the letter came to be made public.

The plaintiff contends that there are two scenarios which support his claim that the information was published by the defendant. First, the plaintiff claims that the defendant published the information by sending a copy of the letter to the Director of the Division of Personnel Services. Second, the plaintiff claims that the defendant could have set into motion a series of events which the defendant knew would lead to the publishing of the letter.

The plaintiff's first argument concerning publication is that the defendant sent a copy of the termination letter to the Director of the Division of Personnel Services ("director"). Stigmatizing statements contained in a personnel file can form the basis for a liberty interest claim if the statements are not restricted to internal use and are shared with potential employers. *See, e.g., Bailey v. Kirk,* 777 F.2d 567 (10th Cir.1985). The plaintiff claims "[i]t is reasonable to infer from this fact that defendant caused a copy of his letter of May 9, 1997, to be placed in plaintiff's employment file, and that prospective employers, or at least other state agencies, will have access to plaintiff's employment file."

The defendant claims that the plaintiff's assertion rests solely on speculation and that there is no evidence that the letter has ever been placed in the plaintiff's personnel file or that it is available to prospective employers. In addition, the defendant claims that he is entitled to qualified immunity for his actions because he was simply complying with Kansas law when he sent a copy of the letter to the Director of the Division of Personnel Services.

The plaintiff has not produced any information, beyond mere allegations, that the letter provided to the director is included in his personnel file or that it has ever been made available to prospective employers. The defendant claims that the plaintiff has not produced enough evidence to survive the claim of qualified immunity. The court is certainly mindful of the fact that a qualified immunity defense raises the standards of what the plaintiff must show in order to survive a motion to dismiss, *see Dixon v. Richer,* 922 F.2d 1456,

1460 (10th Cir.1991), and that issue of qualified immunity should be decided as early as possible in a case so that a public official's protection against the demands of a lawsuit can be protected if the immunity defense is upheld, *see Workman v. Jordan,* 958 F.2d 332, 336 (10th Cir.1992). However, the court finds that this issue cannot be properly decided at this time. Until the plaintiff is allowed discovery from the defendant concerning the termination letter, specifically whether the letter is in his personnel file and whether the letter is or has been available to prospective employers, the plaintiff cannot do anymore than he has. Generally, the plaintiff's bare allegations that the letter might be in his personnel file and that potential employers might have access to it would not be enough to survive the claim of qualified immunity. However, when the plaintiff cannot make a greater showing until information is provided by the defendant through the discovery process, the claim must be able to survive until at least partial discovery has been completed. The defendant would then be entitled to raise the issue of qualified immunity by way of a motion for summary judgment at that time.

█ Although an issue remains as to whether the defendant actually published the letter by forwarding it to the director, the court finds that the defendant could not be held liable for violating the plaintiff's liberty interests by forwarding a copy of the termination letter to the director even if a copy of it is contained in the plaintiff's personnel file and potential employers are allowed access to the letter. In order to overcome the defendant's claim of qualified immunity, the plaintiff must show that a reasonable person in the defendant's position would have known that his or her conduct violated the plaintiff's rights. *Latta v. Keryte,* 118 F.3d 693, 698 (10th Cir.1997). As noted by the defendant, he was required by Kansas law to include the reasons for the plaintiff's dismissal in the termination letter, and was required to forward a copy of that letter to the Director of the Division of Personnel

Services. *See* Kan.Stat.Ann. § 75–2949(b) (1997). No official could reasonably have known that he was violating the plaintiff's rights by complying with a legal requirement that he forward a copy of the termination letter to a third party. The defendant followed clearly established law by forwarding this letter to the director and could not reasonably have known that by complying with the law, he was violating the plaintiff's rights. Because the plaintiff cannot show that the defendant reasonably should have known that he was violating the plaintiff's constitutional rights by sending the letter to the director, he must be able to show his second allegation—that the defendant set into motion a series of events which led to the publication of the letter.

█ Relying on *Miller v. City of Mission, Kan.,* 705 F.2d 368 (10th Cir.1983), the plaintiff claims he can show that the defendant published the alleged stigmatizing statements by showing that the defendant set in motion a series of acts by others which the defendant knew, or should have known, would cause others to inflict the unconstitutional injury.

In *Miller,* the plaintiff was an assistant police chief who brought suit against the city, its former mayor, and several former city council members alleging deprivation of his liberty and property interests. Although it was undisputed that the mayor had the sole authority to fire the plaintiff, the city council members were also sued for damages resulting from the firing. The basis for this claim was evidence which showed that the mayor would not have fired the plaintiff without a hearing without the support and encouragement of the council members. The council members claimed that there was insufficient evidence to support the jury's finding that they were involved in the firing. The Tenth Circuit Court of Appeals held that "[t]he jury could have reasonably inferred from the trial record that the defendant council members either directly participated in the termination process, or set in

motion a series of events by others which they reasonably should have known would result in Miller's dismissal without a hearing." *Miller v. City of Mission, Kan.*, 705 F.2d 368, 375 (10th Cir.1983). It is the second scenario, setting into motion a series of events by others, in which the plaintiff in this case relies to show that the defendant can be held liable for publishing the termination letter.

The court finds that although the holding in *Miller* is applicable to this case, the factual differences between *Miller* and the case at bar make it clear that the plaintiff cannot rely on *Miller* to survive the defendant's motion to dismiss. In *Miller*, there was a clear, well laid out series of events undertaken by the counsel members which led to Miller's dismissal. It was clear that the mayor would not have fired Miller without the encouragement and support of the council members. However, unlike the plaintiff in *Miller*, the plaintiff in this case does not outline for the court what "series of events" were set into motion by the defendant. The plaintiff points out that his employment with the Kansas Department of Revenue had been the subject of previous media attention and then simply states:

> In light of these earlier media reports concerning plaintiff's employment with the Department of Revenue, it is not beyond reason to infer that defendant was either personally involved in the publication of his stigmatizing statements about plaintiff in the June 12 article in *The Topeka Capital–Journal,* or that defendant "set in motion a series of events by others" which he reasonably should have known would result in publication of his stigmatizing statements.

Because the defendant has raised the defense of qualified immunity, the plaintiff's burden in combating the motion to dismiss is heightened. The plaintiff has given no indication, whatsoever, as to what series of events he claims the defendant set into motion.

Upon reviewing the record, the court finds that the plaintiff has failed to make a sufficient showing that the defendant set into motion a series of events that led to the publication of the termination letter. The plaintiff must do more than show that there is a hypothetical factual situation under which the defendant could be held liable. The plaintiff must allege that certain facts are present which place this case within that factual situation. The court agrees that if the defendant set into motion a series of events that led to the publication of the termination letter he could be held liable. However, the plaintiff has not made any allegations or provided any facts which show that this did in fact take place. To allow the plaintiff to proceed in this case without doing anything beyond stating that there is some factual situation which could exist that would make the defendant liable would, in effect, make the qualified immunity defense worthless to the extent it is designed to "shield public officials from undue interference in the performance of their duties as a result of baseless claims." *See Pueblo Neighborhood Health Centers, Inc. v. Losavio,* 847 F.2d 642, 645 (10th Cir.1988).

The court finds that the plaintiff cannot show that the defendant can be held liable for publishing the stigmatizing statements contained in the termination letter. The defendant cannot be held liable for forwarding a copy of the letter to the Director of the Division of the Division of Personnel Services because he was simply obeying Kansas law and he had no indication that doing so would violate the plaintiff's constitutional rights. In addition, the plaintiff has failed to produce any factual allegations that the defendant set into motion a series of events which he knew or reasonably should have known would result in the publication of the letter. Because the plaintiff cannot show an essential element of his claim contained in Count II of the amended complaint, publication of the statements, the court finds that the motion to dismiss should be sustained.

### C. Adequate Name Clearing Hearing

The defendant claims that even if the plaintiff can show the essential elements of his constitutional claim in Count II of the amended complaint, the defendant provided the plaintiff with an adequate name clearing hearing. Because the court finds that the plaintiff's claim fails because he cannot show all the essential elements of his claim, the court does not need to address the issue of whether the plaintiff was given an adequate name clearing hearing.

## IV. CONCLUSION

The court finds that the motion to dismiss in this case must be granted. The defendant has raised the defense of qualified immunity. By doing so, the plaintiff is subject to a heightened pleading standard and is required to "come forward with facts or allegations sufficient to show both that the defendant's alleged conduct violated the law and that the particular law was clearly established when the alleged violation occurred." *Pueblo Neighborhood*, 847 F.2d at 646. The court finds the plaintiff has failed to show that the defendant can be held liable for publishing the alleged stigmatizing statements. Therefore, the motion to dismiss will be granted.

**IT IS THEREFORE BY THIS COURT ORDERED** that the defendant's Motion to Dismiss (Doc. 30) is granted. Count II of the amended complaint is hereby dismissed.